IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 19-00025-SOM |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER REGARDING REMAND |
| vs. | ) | |
| | ) | |
| NOLAN NISHIDA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**ORDER REGARDING REMAND**

Defendant Nolan Nishida was found guilty by a jury of attempted persuasion, inducement, or enticement of a minor to engage in unlawful sexual activity in violation of 18 U.S.C. § 2422(b). He appealed, and the Ninth Circuit affirmed in part and vacated and remanded in part. The Ninth Circuit vacated this court's denial of Nishida's challenge during trial under *Batson v. Kentucky*, 476 U.S. 79 (1986), and remanded the case for this court "to determine in the first instance whether the government engaged in purposeful discrimination." *United States v. Nishida*, No. 20-10238, 2021 WL 3140331 at *1 (9th Cir. July 26, 2021)(unpublished).

There are three steps in a *Batson* challenge. In the first step, the defendant must make a prima facie showing that the prosecutor based a peremptory challenge on a prohibited ground such as race or, in this case, gender. If that is done, then the burden shifts to the prosecutor to provide a gender-

neutral explanation for the peremptory strike being challenged. The third step requires the trial court to "determine whether the defendant has carried his burden of proving purposeful discrimination." *Hernandez v. New York*, 500 U.S. 352, 358-59 (1991). The jury in the present case ended up with eight women and four men after the Government used all six of its peremptory challenges to strike men. On appeal, Nishida argued that this court had not performed the third step by making any determination going to purposeful discrimination.

This court offered the parties an opportunity to propose the procedure by which this court should comply with the Ninth Circuit's directive. Neither party asked for an opportunity to brief or argue the matter. This court therefore proceeds to state its determination.

This court begins by stating that, at the time it selected the jury, it had indeed determined that Nishida had not met his burden of establishing that the Government had engaged in purposeful discrimination. This court failed at the time to state that determination, but the court nevertheless determined that the Government had provided credible explanations for its peremptory strikes, that its explanations were not pretextual, and that there was no basis for a finding that the Government had engaged in purposeful discrimination. Had the court determined otherwise, this court would never have proceeded with the trial

or with the jury as selected.

Admittedly, this judge cannot bring up in her memory a clear and complete account of every word uttered or of every image in the jury selection that occurred in this case on February 11, 2020. This court does, however, have memories of those proceedings that it is drawing on and that are clearer than might normally be expected. One reason for that is that *Batson* challenges are extremely unusual for this judge, and therefore memorable. In addition, this case happens to be the last "regular" trial this judge presided over. That is, this trial preceded the current pandemic and so involved full use of the jury box, jurors sitting side-by-side, and no facial masks. After this trial, the judge had no trial at all for more than a year because of the coronavirus pandemic. The judge eventually presided over a trial in June 2021, but it was a nonjury civil trial held in a courtroom with a clear plastic wall between the bench and the rest of the courtroom, witnesses testifying from a booth made of clear plastic, repeated sanitization of surfaces, lawyers who voluntarily entered their vaccination status into a court database, etc. The trial of this case is therefore not clouded by an overlay of later trials.

Added to this actual recollection is this judge's knowledge of how this judge operates, especially during trial. This judge does not forge ahead if this judge has concerns about

3

whether counsel has offered a pretext.

The court acknowledges that the Ninth Circuit's direction to this court on remand might be read as assuming that no determination as to purposeful discrimination had been made at all, rather than contemplating that this court had simply failed to state any determination.  The Ninth Circuit refers to the need for this court "to determine *in the first instance* whether the government engaged in purposeful discrimination."  *Id.* at *1 (emphasis added).  To avoid raising any issue in this regard, this court is both (1) stating the determination it did indeed make but failed to articulate, and (2) reviewing the record anew with an eye toward making a determination as if it had never made one.  The result is the same: this court accepts the Assistant United States Attorney's proffered explanations as credible and nonpretextual and states its determination that Nishida failed to establish that the Government engaged in purposeful discrimination.  In a further attempt to avoid creating controversy, this court, while unaware of any precedential bar on its invitation to the Government following jury selection to provide written explanations of its peremptory strikes, limits its review on this remand to those explanations provided by the Government orally at sidebar in the courtroom during jury selection.

By way of explanation of its determination regarding

the lack of purposeful discrimination, this court stresses several matters, some of which may not be clear from the transcript.

First, this court was physically present in the courtroom with the prospective jurors. As the Ninth Circuit noted, "The government's explanation for striking Juror 14 centers on his demeanor, into which the district court had superior visibility." *Id.* at *3. The Government explained that it struck Juror 14 because he made "sort of a flippant comment." ECF No. 83, Transcript of Proceedings of February 11, 2020, PageID # 694. That explanation was at the time and is now consistent with this court's observation and recollection of Juror 14. Indeed, what the court observed of Juror 14 in the courtroom was an unusual demeanor.

At the suggestion of Nishida's counsel (*see* ECF No. 107), this court, in preparing this statement of its determination, had court staff retrieve the audio recording of voir dire proceedings in this case so that this court could review the recording.[1] The recording makes clear that Juror 14's

---

[1] The court directed court staff to create a CD with the audio version of voir dire proceedings and to file that in the record of this case. It can be found at ECF No. 110. Copies of the CD are available to counsel for the usual fee charged by the court, and the Clerk of Court can provide it to the Ninth Circuit if so requested by that court in any future appeal. (Physical items such as recordings or nondocumentary exhibits are not usually transmitted by the Clerk to the Ninth Circuit unless expressly requested by that court, but of course counsel may

remarks were substantially more casual than the remarks of other prospective jurors. While other jurors sometimes spoke casually, the tone used by Juror 14 was considerably more relaxed than the tone used by other jurors. Nishida argued to the Ninth Circuit that casualness should not be conflated with the flippancy referred to by the Government, but indeed Juror 14's casualness was so pronounced as to rise to flippancy.

Juror 14's remarks were brief but distinctive. During the portion of voir dire in which each juror was asked to stand and provide brief biographical information, Juror 14 began his segment by very emphatically saying, "Howzit," a common casual local contraction for "How is it," meaning "How are you doing?" *Id.* at PageID # 656. This greeting is so common that it is not clear to this court that it is reserved for use by people raised in Hawaii. People who have moved to Hawaii possibly adopt it in casual conversation. Nor is use of the greeting limited to certain races or ethnicities. Although the greeting is common in everyday conversation, two things about Juror 14's use of the greeting are notable. For one thing, the greeting is most assuredly *not* common in formal settings. Here, the greeting is entirely gratuitous, and no other juror deemed it necessary to

---

freely submit the required number of copies of the recording to the Ninth Circuit when counsel files excerpts of record in the event of a future appeal.) This judge listened to the recording on court equipment that included a clock showing that Juror 14's remarks began at 2:01:44.

include any analogous greeting as a preface to providing biographical information.  This judge cannot recall hearing another juror use the greeting in voir dire in the scores of jury selection proceedings this judge has presided over.

Juror 14's use of the greeting was also particularly notable because he accented the second syllable, while the first syllable is more commonly accented.  The greeting therefore left a larger-than-usual impression.  This court cannot say whether that influenced the Government's counsel or not, but it influences this judge, who grew up in Hawaii and is accustomed to the greeting.  In reviewing the recording, this judge finds that the unusual accent renders the greeting (already unusual in a courtroom setting) more distinctive to the trial judge than it otherwise would have been.

Also notable was the laughter elicited by the exchange between the court and Juror 14.  The laughter is audible on the recording, although not noted in the transcript, a circumstance that is not unusual in this court's experience reviewing transcripts.  In particular, Juror 14's tone was extremely jocular as he said, "And I live with a bunch of people."  *Id*. at PageID # 287.  If one listens to the recording, one can hear murmurs of laughter from time to time throughout the entire jury selection process, elicited either by remarks by the judge or by amusing remarks by other prospective jurors.  However, the

laughter was on occasion much more than a murmur as Juror 14 engaged with the judge. Possibly, the audible laughter from the audience was caused in whole or in part by the judge's reaction to Juror 14's statements, rather than by Juror 14 on his own. But what is clear is that it was indeed Juror 14 himself who elicited pronounced laughter from the judge herself with his comment about "living with a bunch of people," as indicated by the laughter amplified by the microphone the judge was speaking into. While the judge on other occasions chuckled, those chuckles were less hearty than the laughter following Juror 14's statement about living "with a bunch of people." Clearly, Juror 14 was making an impression that was different from the impression left by other prospective jurors.[2]

The judge's reaction can be heard in her tone of voice as she responded to Juror 14's reference to living "with a bunch of people." The judge said, "Okay. I was kind of, like, worried about making you tell me what they do. How many other people?" *Id*. The judge's words and tone reflected concern about whether

---

[2] Even when one listens to the recording of, for example, the exchange with the juror who used the word "crap" (see ECF No. 83, PageID # 682), which the parties have previously discussed and compared to or contrasted with Juror 14's remarks, the laughter is not as pronounced, either from the judge or from the audience. The same can be said about the comparative reactions to, for example, the remark by a juror about being "okay'ish" with juror service, *id*. at PageID # 655, and the remark from another juror about living with a dog, which the judge mistook for a statement about living with a daughter, *id*. at PageID # 664.

Juror 14 had reasons not to state what jobs the other people had. The judge turned to the number of other people as prefatory to getting detail about occupations. Juror 14 responded, "Twenty." *Id.* This was such a surprisingly large number that the judge said, "Okay. Never mind," worried that the time involved in running through so many occupations would be prohibitive. As it turns out, the recording indicates that Juror 14 added, "I live with more," although that statement is not included in the transcript. The recording of the laughter at this point not only supports the Government's explanation and concern, it also supports this court's determination that Juror 14 was indeed unusually casual or flippant, and that the Government's explanation for striking Juror 14 for reasons unrelated to his gender was not a pretext for purposeful discrimination.

Second, quite apart from this court's ability to observe Juror 14, this court also observed the AUSA. The court's impression of the AUSA was that she was sincere and forthcoming in explaining what was behind her strikes. This was not only the court's observation during jury selection, it was also consistent with this court's views of the AUSA formed over time. It happens that the AUSA had appeared before the judge on many occasions before jury selection occurred in this case, including in two prior trials. Throughout the numerous occasions that this court had interacted with the AUSA, this court had never once thought

9

the AUSA was engaged in purposeful discrimination.  Nor had this court ever suspected that her statements were attempts to conceal her true motivation.  Indeed, even when, in an earlier trial, the judge repeatedly expressed concern to the prosecution team (including the AUSA in issue here) about its handling of that case, the judge's concern was never even close to being about duplicity, pretext, or discrimination on the part of the AUSA.  In short, in deeming the AUSA credible, nonpretextual, and lacking in purposeful discrimination with respect to jury selection in this case, this court was relying not only on its observations of the AUSA in this very case, but also on the court's overarching impressions of the AUSA, gathered over a period of years.

Of course, this court is not saying that it will automatically believe or accept everything this AUSA or indeed any other attorney says.  Both this AUSA and Nishida's counsel have sometimes persuaded this court, sometimes not.  But this court's determination in connection with the *Batson* challenge was reached in the shade of the umbrella created by the AUSA's appearances in other cases before this very trial judge.  That is not clear from the transcript but was and is a factor in the court's determination.[3]

---

[3] So as not to leave any misimpression or to create any concern that this court is expressing any sort of favoritism, this court (perhaps unnecessarily) states here that it has a

This court understands that its determination must go to more than the plausibility of the Government's explanations. *United States v. Alanis*, 335 F.3d 965, 969 (9th Cir. 2003).  This court's job includes determining whether the gender-neutral explanations provided by the Government are relevant to the case and are the Government's genuine reasons for any of its strikes, not pretexts designed to conceal purposeful discrimination. *United States v. Alvarez-Ulloa*, 784 F.3d 558, 565 (9th Cir. 2015).

Juror 14's attitude, tone, and words gave the Government grounds to worry that he would not take the case seriously.  The Government's reaction was a natural one.  The Government's stated reason for striking Juror 14 was its actual reason.  Nishida has not shown and this court does not itself find that what the Government stated was "a pretext invented to hide purposeful discrimination."  *Id*.

The court places this determination into the case file. The Ninth Circuit's remand ruling said, "The district court is to hold a new trial only if it determines that a *Batson* violation has occurred."  Having found no *Batson* violation, this court does

---

similarly high opinion of the sincerity and ethics of the other attorneys in this case.  This applies to Nishida's attorneys, including lead counsel for Nishida, who has also appeared before this court numerous times, including in a prior trial.  This court's view of the attorneys other than the AUSA who explained the Government's peremptories is not, however, relevant to the present determination.

not order a new trial.  The court's understanding is that the previously entered judgment remains in effect.

DATED: Honolulu, Hawaii; August 27, 2021.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

*United States v. Nishida*, CR 19-00025-SOM-01; ORDER REGARDING REMAND